2013-1147

# United States Court of Appeals
# for the Federal Circuit

COMAPER CORPORATION,

*Plaintiff-Appellant,*

*v.*

ANTEC, INC., BEST BUY CO., INC.,
and MICRO ELECTRONICS, INC.,

*Defendants-Appellees.*

*Appeal from the United States District Court for the Eastern District of Pennsylvania in Case No. 05-CV-1103, Judge Petrese B. Tucker.*

## BRIEF OF DEFENDANTS-APPELLEES

ROBERT P. ANDRIS
LAEL D. ANDARA
ROPERS, MAJESKI, KOHN
& BENTLEY
1001 Marshall Street
Redwood City, CA  94063
Telephone:  (650) 364-8200
Facsimile:  (650) 780-1701

*Attorneys for Defendants-Appellees*

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

COMAPER CORPORATION v. ANTEC, INC., No. 2013-1147

## CERTIFICATE OF INTEREST

Counsel for the Appellees, Antec, Inc., Best Buy Co., Inc. and Micro Electronics, Inc., certifies the following (use "None" if applicable; use extra sheets if necessary):

1. The full name of every party or amicus represented by me is:

   Antec, Inc., Best Buy Co., Inc. and Micro Electronics, Inc.,

2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

   Antec, Inc., Best Buy Co., Inc. and Micro Electronics, Inc.,

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

   None

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

   Robert P. Andris and Lael D. Andara
   Ropers, Majeski, Kohn & Bentley
   1001 Marshall Street, Suite 500, Redwood City, CA 94063

April 25, 2013

Date

/s/  Robert P. Andris

Robert P. Andris
Counsel for Appellees

# TABLE OF CONTENTS

*Page*

CERTIFICATE OF INTEREST ...................................................................i

TABLE OF AUTHORITIES ....................................................................iv

STATEMENT OF RELATED CASES ......................................................vi

STATEMENT OF JURISDICTION........................................................1

STATEMENT OF ISSUES ......................................................................1

COMBINED STATEMENT OF THE CASE AND STATEMENT OF FACTS .................................................................................................1

    1.    The Parties ................................................................................1

    2.    Procedural History....................................................................1

    3.    Evidence Elicited At Trial........................................................3

        a.    While Computers And Their Components Have Gotten Smaller Over Time, They Have Always Been Hot ...................3

        b.    Because Their Parts Are Expensive And Frequently Break, There Has Always Been a Motivation to Create a Modular Device That Slides Into A Standardized Slot In A Computer System .................................................................6

        c.    Claim Elements ........................................................................7

        d.    Rack Mount Computing Systems Are Analogous Art .............8

            (1)    Federal Circuit opinion (Fujitsu, CDC Nova 3 Mini Module, IBM RISC 6000) ......................................8

            (2)    Comaper Stipulated That The Prior Art Devices Are Analogous Art...........................................................9

        e.    There Is No Dispute That The Three Antec Devices Read On The '955 Patent .................................................................11

f.      The Following Four Prior Art Devices, Manuals, And
        Printed Publications Contain All Of The Elements Of
        Claims  1 And 12 Of The '955 Patent ......................................12

        (a)    The Fujitsu Device (1986)................................13

        (b)    The CDC Nova 3 Mini Module Device (1986).............15

        (c)    The AS/400 Device (1992)...........................17

        (d)    The PCC 2000 Fan (1981)............................18

ARGUMENT ............................................................................20

A.      Standard of Review ..........................................................20

B.      After Viewing All Of The Devices And Listening To All Of
        The Testimony, The District Court Properly Granted JMOL
        Because The '955 Patent Is Invalid....................................21

        1.     The District Court Correctly Concluded The Prior Art
               Devices Anticipate The '955 Patent As A Matter of Law........21

               a.     Since The Prior Art Has All The Features Of The
                      Infringing Devices, It Anticipates The '955 Patent........22

               b.     Comaper's Attempt To Limit The Scope Of The
                      Patent Should Be Rejected .............................................28

        2.     Comaper's Adaptation of An Old Idea To New
               Technology Renders The '955 Patent Obvious As A
               Matter of Law.......................................................................31

CONCLUSION ............................................................................37

CERTIFICATE OF SERVICE ..............................................................38

CERTIFICATE OF COMPLIANCE........................................................39

# TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*Agrizat v. Woodstream,*
  550 F.3d 1337 (Fed. Cir. 2008)................................................ 32, 33, 34

*American Calcar v. American Honda Motor Corp.,*
  651 F.3d 1318 (Fed. Cir. 2011)..................................................... 21, 26

*Beckson Marine v. NFM Inc.,*
  292 F.3d 718 (Fed.Cir.2002)...............................................................22

*Boston Scientific v. Cordis,*
  544 F.3d 982 (Fed. Cir. 2007)............................................................34

*Clear Value v. Pearl River Palmers,*
  668 F.3d 1340 (Fed. Cir. 2012)................................................... 21, 25

*Gaglardo v. Connaught Labs,*
  311 F.3d 565 3rd. Cir. 2002)..............................................................32

*In re Clay,*
  966 F.2d 656 (Fed. Cir. 1992)..............................................................9

*KSR International v. Teleflex,*
  127 S.Ct. 1727 (2007)................................................................. 33, 34

*Leap Frog Enterprise v. Fisher Price,*
  485 F.3d 1157 (Fed. Cir. 2006)..........................................................36

*Lewmar Marine Inc. v. Barinet Inc.,*
  827 F.2d 744 (Fed. Cir. 1987)............................................................22

*Lightening Lube Inc. v. Witco Corp.,*
  4 F.3d 1153 (3rd Cir. 1993) ...............................................................20

*Pannu v. Iolab Corp.,*
  155 F.3d 1344 (9th Cir. 1998) ...........................................................27

*Perkin-Elmer Corp. v. Computervision Corp.,*
  732 F.2d 888 (Fed. Cir. 1984)............................................................27

*Peters v. Active Manufacturing*,
    129 U.S. 530 (1889) ....................................................................22

*Pitts v. Delaware*,
    646 F.3d 151 (3rd Cir. 2011) ......................................................20

*Star Scientific v. R.J. Reynolds*,
    655 F.3d 1364 (Fed. Cir. 2011).................................................21

*Tokai v. Easton Enterprises*,
    632 F.3d 1358 (Fed. Cir. 2011)..................................................35

*Uniloc USA, Inc. v. Microsoft Corp.*,
    632 F.3d 1292 (Fed. Cir. 2011)..................................................20

*Wang Labs., Inc. v. Toshiba Corp.*,
    993 F.2d 858 (Fed. Cir. 1993).......................................................8

*Wyers v. Master Lock*,
    616 F.3d 1231 (Fed. Cir. 2010)..................................................35

## Statutes

28 U.S.C. § 1295(a)(1) ........................................................................1

35 U.S.C. § 102(b) ...........................................................................21

35 U.S.C. § 103 ...................................................................................8

## Rules

Fed. R. Civ. Pro. 50(a) .......................................................................2

## <u>STATEMENT OF RELATED CASES</u>

Counsel is unaware of any other appeal in or from the same civil action or proceeding in the lower court or body that was previously before this or any other appellate court.  There are also no cases known to counsel pending in this or any other court that will directly affect or be directly affected by this Court's decision in the pending appeal.

## STATEMENT OF JURISDICTION

The Court has jurisdiction over this matter under 28 U.S.C. § 1295(a)(1) as this is an appeal from a final judgment.

## STATEMENT OF ISSUES

Did the District Court properly rule that the '955 Patent was invalid where the prior art included devices which were enlarged versions of two products found to literally infringe the Patent?

## COMBINED STATEMENT OF THE CASE
## AND STATEMENT OF FACTS

### 1.     The Parties

Comaper Corporation is a Pennsylvania corporation which is the owner of U.S. Patent 5,955,955 (the '955 Patent).  Comaper never practiced nor licensed the '955 Patent.  Defendant Antec Inc. is California corporation which manufactured and sold three drive bay cooling fans.

### 2.     Procedural History

Comaper sued Antec in the United States District for the Eastern District of Pennsylvania for infringement of the '955 Patent.  The '955 Patent pertains to a cooling device for a computer's drive bay.

The claims of the '955 Patent do not limit the invention to cooling desktop, Personal Computers (PCs).  Rather, the specification states that the size and location of the drive bay region may vary among computers.

In October 2007, a first jury trial was conducted on infringement and validity.  The jury returned a verdict that the two Antec devices infringed the relevant claims of the patent.  The jury also specifically found that independent claims 1 and 12 were valid, while at the same time it found that the dependent claims were valid.  The verdict was overturned on appeal because of the inconsistent verdict and the case was remanded for a new trial as to anticipation and obviousness.  In its opinion, the court found that the prior art "rack mount" device, the Fujitsu MK, was "analogous art" for purposes of an invalidity analysis.

A second jury trial was conducted in January of 2011.  Two expert witnesses testified on behalf of Antec and one on behalf of Comaper.  More specifically, Lyle Bickley testified on behalf of Antec as a computer historian.  Sellam Ismail testified as a computer collector, providing various devices from his personal collection.  Over Antec's objection, William Corcoran, one of the inventors, testified on behalf of the plaintiff as an expert witness.  Prior to retrial, both of Antec's experts submitted supplemental expert reports as to invalidity.

At the close of evidence, both parties made Rule 50(a) motions for judgment as a matter of law.  After the trial court denied both motions, plaintiff stipulated to

2

the dates and authenticity of each of the prior art devices that Antec discussed during trial and the court agreed with plaintiff's suggestion to remove that factual issue from the jury.  The plaintiff also withdrew dependent claims 2, 7, and 13 from the charge.  The court gave instructions to the jury relating to these issues. Independent claims 1 and 12 were before the jury, and both claims were found to be valid.

Thereafter, Antec filed a Motion for Judgment as a Matter of Law of Invalidity or, in the Alternative, New Trial.  After considering the parties' arguments, and after hearing all of the testimony and viewing all of the prior art devices, the District Court upheld its gatekeeper obligation and ruled that the '955 Patent was anticipated as a matter of law.  The court held "…that defendants are entitled to judgment as a matter law based on the clear and convincing evidence provided at trial concerning the anticipation of claims 1 and 12 of Patent '955 and the lack of legally sufficient evidence to support the jury finding of validity concerning the same."  This appeal followed.

### 3. <u>Evidence Elicited At Trial</u>

#### a. <u>While Computers And Their Components Have Gotten Smaller Over Time, They Have Always Been Hot</u>

Antec's expert witnesses provided uncontroverted testimony regarding the state of the prior art, explaining how computers have gotten smaller, faster and less expensive over the last several decades. *A1796:11-19*.  On the second day of trial,

3

Mr. Bickley provided background testimony regarding the history of computers as the systems have evolved from room-sized devices to devices could fit onto a desk top. *A1652-1684*. In discussing the first "minicomputer" the PDP-1, Bickley stated:

> "Remember we were talking about machines that started out being tube machines and it would fill a room and now we are talking about a machine that is just a few racks in size. So here the entire computer is in these racks. So that's it. So it's a machine that is about six feet tall, it's about 20, 23 inches wide in a 19 inch rack configuration and it goes back about six feet. So this is a lot smaller [than the earlier room-sized machines], but it is a full-fledged computer." *A1663:4-16*.

Bickley also testified as to the miniaturization of the components of the computer as technology evolved. *A1656:11-17; A1674-A1675*. The drives had "really shrunk" over time, have become a lot smaller than the 305 RAMAC. *A1661* The 305 RAMAC would have only contained data of about 5 million characters, which is less than 1 MP3 song on iTunes. *A1661*. "TODAY THAT WOULD BE NOTHING, BUT AT THAT PERIOD OF TIME, THIS WAS THE MAX." *Id*. The central processing unit (CPU) which today is the equivalent of a microprocessor, "shrunk down onto a chip." *A1784-1786*.

The Field of the Invention section of the '955 Patent states that "the invention generally relates to a cooling device for a computer. *A1609*. More

4

specifically, the invention relates to a cooling device that mounts into the drive bay of a computer to enhance a computer's ventilation, particularly around the drive bay region." *A1609; 1:10-15*.

The experts explained that, during the entire history of computers, there were always issues of heat causing computer components to fail, and that the solution has always been to bring in air, either through air-conditioning units or just simply fans, to cool down the electrical components. *A1652-1684*.

Bickley testified that modern computers evolved from the ENIAC, which was developed at the University of Pennsylvania in 1946. *A1653*. This computer would fill an entire courtroom and was made up of about 17,000 tubes. Each of these tubes generated the same heat as a 60 watt light bulb and had a high failure rate. *A1655-A1655*. In order to stay functional, this computer had to be kept in an air-conditioned room, with vents that cooled the tubes. *A1655*.

RAMAC computer systems heat problems were likewise solved by using fans to blow air over the drives and other important components. *A1662*. "They solved the heat problem (for the RAMAC computer system) like everybody else solved the heat problem, with fans." *Id*. Likewise, the PDP 8 computers had drives, motors and power supplies that all generated heat. Fans were used to cool these components. *A1682-A1683*.

5

The inventor, William Corcoran, admitted: "We didn't invent fans." *A1847*.

Instead, in 1994, a person of ordinary skill in the art with a heat problem in a

computer would automatically first think to cool that area down by using a fan.

> "I think anyone who had any experience with computers
> before PCs or even if they only had PCs but let's suppose
> they had more typically a person of ordinary skill of the
> art in 1994 had been exposed to minicomputers who had
> seen fans used consistently to cool devices and so it
> would have been obvious to – if you had heat buildup
> any place to use a fan." *A1706*.

    **b.**    **<u>Because Their Parts Are Expensive And Frequently Break,
There Has Always Been a Motivation to Create a Modular
Device That Slides Into A Standardized Slot In A Computer
System</u>**

There was no dispute that the heat sensitive drives themselves generate heat

and contain important information. *A1609*. As such, there has always been a

significant motivation to ensure that a drive or any component of a computer did

not overheat of fail. *Id.* Corcoran explained how a $400 hard drive could be worth

$4 million once someone, such a professor doing research, saved data on it.

*A1820-A1821*.

In addition, it was undisputed that a person of ordinary skill in the art would

be motivated to make computer components modular such that they fit into

standardized openings in the housing of the computer so that the components

themselves could work in different computers and so that they could be replaced if

6

they broke. *A1674-A1675*. From the 1960s through the 1980s as in the Nova 3, one of the standard configurations of a "computer" was the 19-inch rack mount unit. *A1787-A1789; A1794-A1795*. PCs became the standard in the mid-late 1980s with their 5.25 inch drives. *A1783*.

     c.    **Claim Elements**

During the second trial, the Court provided the Jury a list of terms consistent with the Court's previous claim construction (*A2317*), and these definitions were included with the jury instructions. *A1866-1869*. The disclosed invention operated by cooling the **drive bay region**, which was defined by the Court as, "the space ***in*** and immediately adjacent to the drive bay(s)." *A1867*. The Court further defined drive bay slot as "the relatively narrow opening in the housing of the computer that leads to the drive bay." *Id*. The Court defined **drive bay** as "the system space reserved for installation of ***any type of drive*** ." *Id.*

The Court did not define the term "computer," but instructed the jury to "give the rest of the words in the claims their ordinary meaning." *A1869*. The '955 Patent did not limit its claims to a PC or personal computer. *A1609*. Corcoran admitted there was "nothing in [the] patent whatsoever that says that it is limited to these desktop or personal computers." *A1753*.

There is no indication the '955 Patent is limited to personal computer configurations.  Rather, the Patent states that the size and location of the drive bay region may vary among computers.  *A1609; 2:55-56*.

Further, Corcoran admitted, "my patent never says that a rack is not a computer."  *A1848*.  At the same time, Corcoran, the inventor, tried to distinguish desktop PCs from the rack-mounted computer systems that the Federal Circuit had already determined were analogous prior art.  *A1841-1842*.  Sellam also testified that a person of ordinary skill in the art would have understood a rack system to be a computer.  *A1815-A1816*.

Corcoran agreed with Bickley's testimony that a computer contains "central processing units, CPU, plus memory, plus an input and output device.  Generally, that's a computer."  *A1752-1753*.

> ### d.    Rack Mount Computing Systems Are Analogous Art

> #### (1)    Federal Circuit opinion (Fujitsu, CDC Nova 3 Mini Module, IBM RISC 6000)

In the appeal from the first trial, this Court held that the prior art asserted by Antec was analogous prior art.  *A2341-A2345*.  The Court supported its finding by stating:

> "Analogous art is that which is relevant to a consideration of obviousness under [35 U.S.C. § 103]." *Wang Labs., Inc. v. Toshiba Corp.*, 993 F.2d 858, 864 (Fed. Cir. 1993).  Two criteria are relevant in determining whether prior art is analogous: "(1) whether the art is from ***the same field of endeavor***, regardless of the problem addressed,

8

and (2) if the reference is not within the field of the inventor's endeavor, whether the reference still is reasonably pertinent to the ***particular problem with which the inventor is involved***." *In re Clay*, 966 F.2d 656, 658–59 (Fed. Cir. 1992). Undoubtedly, the '955 patent's field of endeavor deals with cooling computers and electronic components." *A2344. (*Emphasis *added*)

The Court continued, "***Antec's asserted prior art references all relate to the same field of endeavor as the '955 patent… Each piece of prior art involves cooling computer electronics using fans to draw cool ambient air***." *Id.* The Court specifically stated that the following two devices were in the same field of endeavor as the '955 patent: the "**IBM AS/400 Model 9404** is a computer system with a drive bay-mounted drive module containing a fan that draws out-side air into the computer," and "[t]he **Fujitsu M2311K** is a large hard disk drive module with a fan unit from the early 1980s that could be installed into a computer system cabinet." A2344-A2345.

"Because these prior art references are in the same field of endeavor as the '955 patent, they are analogous prior art, and it was thus proper for the jury to consider them on the issue of whether the '955 patent would have been obvious." *A2345.*

### (2)    Comaper Stipulated That The Prior Art Devices Are Analogous Art

On the first day of the second trial, both parties made oral arguments regarding the motions in limine they had previously submitted to the Court.

9

*A1614-A1647.* Included in these motions was a motion by Antec to exclude plaintiff from challenging analogous art, *(A1633)* because the Federal Circuit had concluded that the <u>IBM AS/400</u>, the IBM RISC system 6000, and the <u>Fujitsu</u> system were analogous art. *A2344-A2345.* The motion in limine also requested that the other patents and devices before the District Court should also be deemed analogous art, because the Federal Circuit relied on these prior art references in determining the invalidity issue. *A1633-A1647; A2344-A2345*

Plaintiff argued: "your honor, we are not going to contest the analogous art -- this being analogous art." *A1642.* Rather, plaintiff asked to reserve the right to challenge the authenticity of all the devices. *Id.* The Court granted Antec's motion in limine, stating "as far as challenging the analogous art, I believe that -- I will grant that with the understanding that authenticity is always an issue and you will be permitted to raise that." *A1647.*

The authenticity of the prior art references was not disputed by Plaintiff. On Day 6 of the trial, plaintiff stipulated that all of the prior art references predated December 6, 1993, which was a year before the first application. *A1858-A1859.* Plaintiff also recommended that the jury not be asked to determine that these devices predated the patent, requesting to take these questions off of the jury verdict form. *A1857.*

10

e.     **There Is No Dispute That The Three Antec Devices Read On The '955 Patent**

There was no dispute that the Antec Devices each read on the patent whether or not they contained a drive. *A1758; A2032-A2073.* "the Antec devices are made to have a drive in them, but would work without a drive installed." *A1758. (Images from Exhibits K and M below from A1579; A2033; A2056-73).*

 

The experts applied the Federal Circuit's findings in their supplemental experts reports, in searching for prior art devices that would have a "case" and "second opening" as defined in by the Court Construction Order and affirmed by the Federal Circuit. *A1689-1691; A1796.*

The "Second Opening," which is defined as "a separate opening in the case that is exposed to the Drive Bay Region," can be the back of the first opening. *A2341-2342.* "In this case, the Court said that if you have a fan … and one side of the fan where the air goes into the fan, that's the first opening, when you come out of the fan on the other side, that's a second opening." *A1691.* The second opening could be anywhere, so long as it was open to the drive bay region of the computer. *Corcoran, Exh. E, 44:10-45:16.* The <u>drive bay region</u> was defined by the Court as, "the space in and immediately adjacent to the drive bay(s)." *A1866-A1869; A2317-A2318.*

> **f.** **<u>The Following Four Prior Art Devices, Manuals, And Printed Publications Contain All Of The Elements Of Claims 1 And 12 Of The '955 Patent</u>**

The dispute in the recent trial became an argument over semantics, wherein plaintiffs argued that each case that slid into a rack-mount computer system was not inserted into the housing of "a computer," and hence there was no "drive bay slot," wholly ignoring the fact that rack-mounted computer systems like the Fujitsu were deemed to be and stipulated as analogous prior art. *A1821-1848.* Plaintiff's argument that these devices were irrelevant since they were not inserted into a PC computer which would have all the components within a single housing, ignores the fact that these larger, more primitive devices (which are modular cases that contain fans and slide into and mount within computer systems) had solved the

12

same problem (drive failure caused by overheating) in the same manner (with fans

blowing cooler ambient air into the drive bay region in order to cool the drives)

over 10 years before the '955 patent was filed. *A1662; A1669-A1672; A1700-*

*A1701; A1703-A1704.*

There is no dispute that the following four prior art devices have "cases"

with fans mounted within them.  Corcoran acknowledged that cases with fans must

have a power supply in order to operate, so element 8 of claims 1 and 12 is met so

long as there is a functional fan. *A1765.*  Corcoran also agreed that a fan that

blows cooling air in the Drive Bay will, by definition, also blow cooling air into

the Drive Bay Region, since the Drive Bay Region is defined as "the space in and

immediately adjacent to the Drive Bay(s)." *A1845-A1846; A1852-A1853; A2317-*

*A2318.*  That is, if the fans cool the Drive Bay, by definition, they cool the Drive

Bay Region.

### (a)    The Fujitsu Device (1986)

Antec produced the Fujitsu device and various corresponding manuals.

*A2074-2185.* The Fujitsu device is a case that slides into a rack-mounted computer

system and it substantially fills the two-dimensional opening  into the rack. *A1769.*

The Fujitsu device would occupy the entire drive bay slot, and it would be

unworkable if it did not fill the entire drive bay slot. *A1816.*  The first opening is

exposed to ambient air. *A1769.*  The device also has an air movement device and a

13

power supply means.  *A1771-A1772. (Images of Exhibits N and O, below, from A1581; A2076-A2079; A2101; A2110).*





Q.    When we look at a rack and a space for a drive in a rack, for the drive system, why isn't that a slot?

A.    Well, **It's A Slot**, But It's -- That's Not Designated For A Hard Drive, And At The Same Time It's Not Going To The Claim.

Q.    Right.

A.    **It has to be this *relatively* narrow opening in the housing of the computer** that leads to the drive bay that's the drive bay slot.  And the rack is a cabinet. It's not the computer.

Q.    It's a cabinet, so it has *computer* components in it or?

A.    It has discrete *modules*.

*A1821 (emphasis added).*

14

There is no dispute that the case has at least a first opening exposed to ambient air and at least a second opening which exhausts air into the three-dimensional area behind the drive and the area adjacent to it, into the back of the rack. Nor is there a dispute that the purpose of the fan in this device is to cool the drive bay region (the area in and immediately adjacent to the drive bay). *A2317-A2318.*

### (b)   The CDC Nova 3 Mini Module Device (1986)

Antec produced the CDC Nova 3 Mini Module device and two corresponding manuals. *A2186-A2288. (Images of Exhibits T and U to the right and below from A1582; A2189-A2192; A2195; A2196; A2200; A2202.)* The CDC Mini Module device is functionally the same as the Antec devices that were found to have each element of the patent in suit. *A1796-A1797.*



The CDC Nova 3 Mini Module is a module inserted into a <u>computer system</u>. *A1761-A1763.* The case contains a drive and the case slides into the rack mount system. *A1757-1762.* The case contains a drive, a fan, and a power supply. *A1761; A1765-1766.* The

CDC Mini Module has a power supply and three fans, and would work without a drive. *A1758.*







The Mini Module has at least a first opening and at least a second opening. *A1764.* The first opening of the device is exposed to ambient air. *A1765.* The air enters through the front vents. *A1759.* When the air goes in the vent and up inside the cover, it is in the drive bay region. *A1845-A1846.* Without a disk drive

16

installed in the Mini Module, one would be left with a rack with fans mounted in it, that slides into the computer system. *A1758.* There is no dispute that the case has at least a first opening exposed to ambient air and at least a second opening which exhausts air into the three-dimensional area behind the drive and the area adjacent to it, into the back of the rack.

### (c)     The AS/400 Device (1992)

Antec produced the IBM AS/400 device and related materials. *A2289- A2309.  (Images of Exhibit W to the right and below from 1584; A2291; A2300).* The AS/400 Device has a case with at least a first opening exposed to ambient air and at least a second opening exposed to the drive bay region, except that the air passes through a plenum, and the air goes from ambient to ambient. *A1831-A1835.* There is no dispute that the purpose of the fan is to cool the drive bay region (the area in and immediately adjacent to the drive bay), nor that the case fills substantially the entire slot (relatively narrow opening in the housing of the computer).



17



### (d)    The PCC 2000 Fan (1981)

Antec produced the PCC 2000 fan module and demonstrated its modular

nature by demonstrating it could be mounted in the slot of the Nuclear Data 9900,

a 19" rack.   *A2310-A2315 (Images of Exhibit Y to the below from A1584; A2311-*

*A2313).*



Corcoran admitted that the PCC 2000 Fan was ordinarily mounted to the

back of a computer system, and contained at least one fan.  *A1823-A1824.*  There is

no dispute that the fan unit has a case holding two fans and that the case has at

least a first opening exposed to ambient air and at least a second opening exposed to the drive bay region. *A1801-1803*. Nor is there any dispute that the purpose of the fan is to cool the drive bay region (the area in and immediately adjacent to the drive bay): "The purpose of this device was obviously to cool, to keep the drive bay compartment cool, you know, to prevent the hard drive from overheating. Those hard drives generate a lot of heat." *A1801*. There is also no dispute that the case fills substantially the entire slot when it is inserted into a rack system computer. *A2310-A2315*.



However, Plaintiff disputed whether the PCC 2000 is inserted into the "drive bay slot" in the housing of the computer. *A1848*.

Corcoran stated that the only difference between the PCC 2000 and the Antec device is that the PCC 2000 is not inserted into the drive bay slot, since the PCC 2000 is in a rack mount computer system:

Q.    The whole difference is that this opening in your -- by your definition, is not a drive bay slot?

A.    That's a rack and --

19

Q.      This is not a drive bay slot?

A.      Yes, it's not a drive bay slot."

Q.      It's not a relatively narrow opening in the housing of a computer
that leads to a drive bay?

A.      No, it's a rack.  And ***that's an opening in the rack to put
equipment in***.

Q.      Your patent never says that a rack is not a computer, correct?

A.      ***My patent never says that a rack is not a computer***.

*A1848 (Emphasis added).*

## ARGUMENT

**A.      Standard of Review**

"This Court's review of a district court's grant of JMOL is governed by
regional circuit law." *Uniloc USA, Inc. v. Microsoft Corp.,* 632 F.3d 1292, 1301
(Fed. Cir. 2011).  "It is only on rare instances that a jury's verdict in a civil case
should be overturned." *Pitts v. Delaware*, 646 F.3d 151, 152 (3rd Cir. 2011).  In
the Third Circuit, the grant or denial of JMOL is reviewed de novo.  *Lightening
Lube Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3rd Cir. 1993).  JMOL is proper
when, after "viewing the evidence in a light most favorable to the non-movant and
giving it the advantage of every fair and reasonable inference, there is insufficient
evidence from which a jury reasonably could find" for the non-movant.  *Id*.

**B.    After Viewing All Of The Devices And Listening To All Of The Testimony, The District Court Properly Granted JMOL Because The '955 Patent Is Invalid**

**1.    The District Court Correctly Concluded The Prior Art Devices Anticipate The '955 Patent As A Matter of Law**

Under 35 U.S.C. § 102(b), a patent may not issue if the claimed invention was in public use in this country more than one year before the patent's critical date. *Star Scientific v. R.J. Reynolds*, 655 F.3d 1364, 1377 (Fed. Cir. 2011). To anticipate a patent claim under 35 U.S.C. § 102, "a reference must describe…each and every claim limitation and enable one of ordinary skill in the art to practice an embodiment of the claimed invention without undue experimentation." *Clear Value v. Pearl River Palmers*, 668 F.3d 1340, 1344 (Fed. Cir. 2012); citing, *American Calcar v. American Honda Motor Corp.*, 651 F.3d 1318, 1341 (Fed. Cir. 2011).

The District Court correctly concluded that the prior art devices admitted at trial contained each and every limitation of Claims 1 and 12 of the '955 Patent. Each of the devices is comprised of a case which is configured to mount within the drive bay slot of a computer. These cases occupied substantially the entire drive bay slot.

21

### a. Since The Prior Art Has All The Features Of The Infringing Devices, It Anticipates The '955 Patent

At the first trial of this matter, and during the first appeal, Comaper argued vigorously that the accused Antec products, the Antec "Hard Drive Cooler" and the Antec "HD Cooler" literally infringed Claim 1 and 12 of the '955 Patent. The jury, the District Court and this Court agreed, and those issues are law of the case.

Because the same test should apply for anticipation as does for infringement, the Court has long held that "that which infringes if later in time will anticipate if earlier…" in time. *Lewmar Marine Inc. v. Barinet Inc.*, 827 F.2d 744, 748; citing, *Peters v. Active Manufacturing*, 129 U.S. 530, 537 (1889); see also, *Beckson Marine v. NFM Inc.*, 292 F.3d 718, 726. A comparison of the two infringing Antec devices to at least two pieces of prior art (the PCC 2000 and the CDC "mini-module") demonstrates unequivocally that the '955 Patent is anticipated as a matter of law.



The infringing Antec Hard Drive Cooler is a face plate with vents, behind which are mounted three fans (as shown on the images to the right). *A1590; A2033.*

22

Similarly, the PCC 2000 is a face plate with two fans mounted on it (as shown on the images to the right). *A1590; A2311-A2314.*



While the PCC 2000 is 19 and ½ inches across and the hard drive cooler is only 5 1/4 inches across, both are designed to substantially fill an opening in the housing of a computer, and both use ambient air to cool the area immediately behind the fans (the drive bay) and the areas outside the space immediately behind the fans (the drive bay region).

Similarly, the infringing Antec HD Cooler is a sled with a face plate, two sidewalls and a bottom. Fans are mounted behind the face plate and the device is configured to house a disc drive directly behind the fans. *A1579, A1591.*



*///*

23

Likewise, the CDC "mini-module" is a sled with a face plate, two sidewalls and a bottom panel.  Fans are mounted behind the face plate, behind which is mounted a hard drive.  *A1591.*



Likewise, the Fujitsu MK is a sled with a face plate, two sidewalls and a bottom panel.  *A1591.*



Again, while the size of these devices differs, that is where the differences end.  Since each of the prior art devices contain each and every limitation of Claims 1 and 12 as a matter of law, there was insufficient evidence for the jury to conclude that the '955 patent was not anticipated.

24

In *Clear Value v. Pearl River*, *supra*, a jury found the patent in suit was in invalid and infringed, and the District Court denied Pearl River's motion for JMOL of invalidity. Because the jury's conclusion that the patent in suit was valid, was not support by substantial evidence, this court reversed the denial of the JMOL of invalidity.

More specifically, the patent in suit was directed to a process for clarifying low alkalinity water using a blend of high molecular weight quanternized polymer and an aluminum polymer. The only claim at issue was directed to a process for clarification of water of *raw alkalinity less than or equal to 50 ppm…* On appeal, Clear Value conceded that the Hassick reference taught every limitation of the claim at issue. Nevertheless, Clear Value argued that substantial evidence supported the jury's verdict of no anticipation because Hassick's disclosure of clarifying water with alkalinity of 150 ppm was too broad to anticipate the 50 ppm limitation of the patent in suit. The Court disagreed, holding that because Hassick either taught or enabled each and every element of the claim, the jury lacked substantial evidence to find that it did not anticipate that claim. *Id*. at 1346.

As set forth above, to be anticipatory, a reference must described, either expressly or inherently, each and every limitation and enable one of skill in the art to practice an embodiment of the claimed invention without undue

25

experimentation. *American Calcar v. American Honda*, *supra*, 651 F.3d at p. 1341.

As recognized by the District Court, the only differences between the prior art devices and the drawings of the '955 Patent, are that the prior art devices were designed to work with large rack-mounted systems, while the drawings of the '955 Patent describe a desktop personal computer.  While the rack-mounted systems (by design) did not have a single uniform cover like those found on PCs, each of the prior art devices was designed to slide into the "standard" rack-mount space and to substantially occupy the two dimensional area leading into that space.

Further, as the District Court correctly recognized, each of the prior art devices was designed to cool electrical components (hard drives, optical drives…) contained within the space that the cooling device slid into.  Pursuant to the court's claim construction, which contain no size limitation or limitation on the "type" of computer involved, each of the prior art devices anticipate the '955 Patent as a matter of law.

Furthermore, even if the size or case configuration limitations advanced by plaintiffs were found to apply, there can be no dispute that a person of ordinary skill in the art looking at any of the of the prior art devices, and faced with an overheating problem in a personal computer, would have been enabled to practice an embodiment of the claimed invention without undue experimentation.  The

26

prior art devices solve the same problem (overheating) in the same way (by inserting a fan into a modular unit designed to fit into the computer system). Thus, even if the patent is limited to computers with enclosed housings, and if the patent is further restricted to cases that fit within narrow slots in those housings, the '955 Patent is anticipated by each of the prior art devices because those devices would enable a person of ordinary skill to create a smaller modular device that would fit into the standard drive bay of a personal computer. The District Court correctly ruled that, considering the record in a light most favorable to plaintiff, the jury finding of validity was unsupported by substantial evidence at trial. This court should so rule.

Finally, the District Court also correctly found that the jury's verdict was not supported by the law because, even if the jury's findings were supported by substantial evidence, "the legal conclusions implied by the jury's verdict cannot in law be supported by those findings." Citing*, Pannu v. Iolab Corp.*, 155 F.3d 1344, 1348 (9th Cir. 1998); quoting, *Perkin-Elmer Corp. v. Computervision Corp.*, 732 F.2d 888, 893 (Fed. Cir. 1984). Thus, any evidence supporting plaintiff's interpretation, as a matter of law, cannot support a finding that the '955 Patent was valid. The District Court, therefore, correctly ruled that the prior art devices anticipated the '955 Patent. This court should so rule.

27

### b.    Comaper's Attempt To Limit The Scope Of The Patent Should Be Rejected

Comaper's strained reading of the patent in an attempt to distinguish the aforementioned prior art from Claims 1 and 12 in a clear attempt to add limitations and thereby narrow the applicable prior art so as to avoid the patent.

On multiple occasions, Corcoran and counsel argued that the PC 2000, the CDC mini-module and the Fujitsu MK were distinguishable from the infringing Antec devices and the '955 Patent because those devices were not inserted in the opening of a computer's "housing."  Instead, Comaper argued that the aforementioned components of a computer were placed in a "rack system" comprised of a frame of standardized dimensions into which the aforementioned devices were affixed.

As noted by the District Court, at no time during the long history of this case did Comaper assert that the claim term "housing" should be limited to an "enclosure."  While the word enclosure may be one definition of the term housing, a better definition in the context of this patent (which applies to all types of computers), would also include the term "support."

The term "housing" has multiple meanings in various contexts.  It can mean a shelter, a niche for a sculpture or something that covers or protects.  In the context of the '955 Patent, the third definition is most appropriate.  Thus, a common English dictionary provides:

28

"Housing…

3:      Something that covers or protects: as

    a:      a case or enclosure (as for a mechanical part
        of an instrument)

    b:      a casing (as an enclosed bearing) in which a
        shaft revolves:

    c:      a support (as a frame) for mechanical parts."
    *See,* www.merrium-webster.com/dictionary/
    housing downloaded April 25, 2013.

Based on the foregoing definition, the language of the patent in suit, its claims and the insistence of Comaper that the patent applies to all types of computers, a reasonable definition of the term "housing" would be:  a case or enclosure or a support for mechanical parts."

Based on this definition, it is clear that the PCC 2000, the CDC mini-module and the Fujitsu MKs meet the "housing" requirements of Claims 1 and 12.  As recognized by the District Court, Comaper's argument that the prior art is distinguishable because it was not used in a computer "housing" fails as a matter law.  At the very least, the District Court's decision implicitly adopts the construction set forth above, and this court should do the same.

Similarly, plaintiff's argument that the aforementioned prior art devices were not in a "drive bay" because they were not placed in areas "reserved" for drives attempts to add "exclusivity" and "permanence" limitations to the definition

29

of a "drive bay."  Specifically, Comaper argued that the aforementioned prior art devices were not placed in computers that had a "drive bay" because, in rack systems, it is possible to move the various independent components from one location to another on the rack.  Because the components in the rack could be moved, according to Comaper, the computer did not have "system space <u>reserved</u> for installation of any type of drive."

First, under a plain reading of the Court's definition of a "drive bay," the "systems space" involved must only be "reserved" for installation of a drive – the drive itself is not required to be in the computer at all.  Thus, as argued by plaintiff during the first trial and appeal, the PCC 2000 infringed the patent in suit because, even if a drive was not installed at all, the PCC 2000 was mounted in a "drive bay slot" in front of a "drive bay" within the "drive bay region" because a drive <u>could</u> mounted behind the device.  That is, the computer in question was configured such that a drive could be mounted behind a standardized opening.

The same is true with respect to the CDC mini-module and the Fujitsu MK.  Both of these devices are sleds with fans behind their face place, behind which multiple drives may or may not be mounted.  These "areas" behind the face plate are areas in which drives may or may not be mounted.  As such, they are "system space" that is "reserved" for mounting drives and are, by definition, drive bays.

30

Comaper's argument that rack systems do not have drive bays is yet another attempt to add limitations to the court-approved definition of a drive bay. Only system space "permanently" and "exclusively" reserved for the installation of a drive qualifies as a drive bay according to plaintiff. As recognized by the District Court, there are no such limitations on the definition of a drive bay. Since, when installed, drives are necessarily part of the computer "system," any area in the interior of a computer's housing behind a two-dimensional opening in which a drive can be mounted is a drive bay. Like the infringing Antec HD Cooler sled, the CDC mini-module and Fujitsu devices were slid on racks through a two-dimensional opening. When installed, these areas contained system space reserved for the installation of drives and, therefore, said prior art anticipates the '955 Patent.

**2.    Comaper's Adaptation of An Old Idea To New Technology Renders The '955 Patent Obvious As A Matter of Law**

While the District Court refrained from ruling on the parties' arguments regarding obviousness, as asserted by Antec at the trial court level, a separate and independent ground for invalidation of the '955 Patent is that its subject matter was obvious in light of the prior art and the knowledge of a person of ordinary skill in the art. The minor differences, if any, between the prior art devices and the claims of the '955 Patent create a prima facie case of obviousness and there were no secondary considerations of obviousness sufficient to overcome the prima facie

31

case.  The '955 Patent is simply an adaptation of the old idea of modular cooling devices found in rack-mounted computers.  The '955 Patent, therefore, is invalid as a matter of law.

In *Agrizat v. Woodstream*, 550 F.3d 1337 (Fed. Cir. 2008), Agrizat sued Woodstream in the U.S. District Court for the Eastern District of Pennsylvania for infringement of the '636 Patent which was directed to an electronic rodent-killing device.  Defendant Woodstream appealed the District Court's denial of its motion for JMOL that the '636 Patent was invalid and this court reversed.

The court first noted that, under Third Circuit law, a grant of JMOL is appropriate where a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have legally sufficient evidentiary basis to find for the party on that issue.  See, *Gaglardo v. Connaught Labs*, 311 F.3d 565, 568 (3rd. Cir. 2002).

The court then noted that, while a jury verdict of non-obviousness is reviewed for substantial evidence, the ultimate conclusion of obviousness is a question of law.

> "We review the underpinning facts of a jury verdict for non-obviousness for substantial evidence, according due deference to the jury, as always, in its role as fact-finder [citation omitted].
>
> However, as the ultimate conclusion of obviousness is a question of law, it remains our duty as the appellate court

32

to ensure the law has been correctly applied to the facts [citation omitted]. In other words, we review de novo the conclusion on obviousness. Although we are fully cognizant of the hindsight bias that often plagues determinations of obviousness [citation omitted], we are also mindful that '[t] the combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results." *KSR International v. Teleflex*, 127 S.Ct. 1727, 1739 (2007); *Agrizat v. Woodstream*, *supra*, 550 F.3d at pp. 1342-1343.

After discussing the prior art admitted at trial, the Federal Circuit concluded:

"<u>This is a text book case of when the asserted claims involve a combination of familiar elements according to known methods that does no more than yield predictable results</u>. *KSR*, 127 S.Ct. at 1339. The only difference between the gopher zapper and the asserted claims, as conceded by Agrizat, is the type of switch used to complete the circuit that triggers the generator. The asserted claims simply substitute a resistive electrical switch for a mechanical pressure switch employed by the gopher zapper. In favoring resistive switches over mechanical switches, both the dye and madsen patents are directed to solving the same problem as the '636 Patent – the malfunction of mechanical switches in environments prone to dirt and dampness." [Citation omitted; emphasis added.] *Id*., at 1344.

Here, likewise, the asserted claims involve a combination of familiar elements according to known methods that do nothing more than yield predictable results. The only differences between the prior art devices and the '955 Patent are

the size of the devices and the configuration of the computers into which they fit.
As in *Agrizat*, *supra*, updating the rack-mounted prior art devices to work with
modern PCs was obvious as a matter of law and no reasonable jury could hold
otherwise.

In *Boston Scientific v. Cordis*, 544 F.3d 982 (Fed. Cir. 2007), Cordis
appealed from the District Court's denial of a motion for new trial and judgment as
a matter of law following a jury verdict of infringement of the '936 Patent. The
court analyzed the Wolff prior art patent, and then noted:

> "As we have explained, Wolff teaches all of the
> limitations of claim 8, and the record did not contain
> substantial evidence for the jury to conclude otherwise.
> The only qualification to the statement of fact is that all
> of the limitations are found in two separate embodiments
> pictured side-by-side in the [Wolff] patent, not in one
> embodiment. However, [i]f a person of ordinary skill can
> implement a predicable variation, section 103 likely bars
> its patentability." *KSR, supra*, 127 S.Ct. at 1740; *Boston
> Scientific v. Cordis, supra*, 554 F.3d at 991.

This court concluded:

> "The District Court thus incorrectly upheld the jury's
> verdict of non-obviousness. Where…the content of the
> prior art, the scope of the patent claim, and the level of
> ordinary skill in the art are not in material dispute, and
> the obviousness of the claim is apparent in light of these
> facts, summary judgment [or JMOL] is appropriate.
> [Citation omitted.]…The expert's testimony that Wolff
> 'does not teach a metallic stent having a two-layer

34

> coating' [citation omitted], is undisputed; as we have
> explained above, we agree that Wolff does not expressly
> teach such a stent.  However, it teaches two embodiments
> that together render such a stent obvious…we are free to
> override the jury's legal conclusion on the ultimate
> question of obviousness without deference.  [Citation
> omitted.]  We therefore hold as a matter of law that the
> claim 8 would have been obvious in view of Wolff."  *Id.*,
> at 992; see also, *Wyers v. Master Lock*, 616 F.3d 1231,
> 1241-42 (Fed. Cir. 2010).

More recently, in *Tokai v. Easton Enterprises*, 632 F.3d 1358 (Fed. Cir.

2011), the Federal Circuit affirmed the District Court's grant of summary judgment

of invalidity.  There, the patents in suit related to safety utility lighters having

extended lighted rods useful for lighting barbeque grills.  The Federal Circuit first

concluded that the District Court properly excluded expert testimony and declined

to impose an enhanced burden to rebut the presumption of validity because the

asserted prior art references were not considered by the PTO during prosecution.

As to obviousness, the court concluded:

> "Accordingly, the undisputed facts in this case –
> including the state of the prior art, the simplicity and
> availability of the components making up the claimed
> convention, and an explicit need in the prior art for safety
> utility lighters – compel a conclusion of obviousness as
> to the subject matter of each of the asserted claims."
> *Tokai v. Easton*, *supra*, 632 F.3d at 1371.

Here, if the court finds that the prior art devices did not disclose "each and every" element of the '955 Patent in a single device, it is undisputed that a person of ordinary skill with full knowledge of the prior art devices could have easily adapted those devices to fit the modern 5 ¼ inch slot on many PCs.  Both Bickley and Ismail testified that the Antec devices and the claims of the '955 Patent were simply smaller versions of the rack-mounted 19 inch devices used in the 1960s, 1970s and the 1980s.  Nowhere in Corcoran's testimony is there any dispute that it would have been obvious for a person of ordinary skill to adapt the prior art devices to fit the modern drive bay slot.  *See, Leap Frog Enterprise v. Fisher Price*, 485 F.3d 1157, 1162 (Fed. Cir. 2006) ["We agree with the District Court that one of ordinary skill…would have found it obvious…to update [the prior art] using modern electronic components in order to gain the commonly understood benefits of such adaptation, such as decreased size, increased reliability, simplified operation and reduced costs].

A prima facie case of obviousness was established when Bickley and Ismail were examined on the prior art devices.  Independently, a prima facie case of obviousness was established through Corcoran's testimony when he admitted that the prior art devices had all of the features of the infringing Antec devices and that the only difference between them was their size and the configuration of the computer in which they were installed.  Comaper never attempted to rebut the

prima facie case with secondary considerations of non-obviousness. Plaintiff had

no commercial success with its products since it never sold or licensed the same.

There is no evidence of copying for the same reason. At bottom, the '955 Patent

embodies a simply adaptation of at least three prior art devices to a smaller form so

that it is compatible with modern personal computers. As a matter of law, such

adaptation is obvious and the District Court properly ruled the Patent to be invalid.

## <u>CONCLUSION</u>

Based on the foregoing, it is respectfully submitted that the District Court's

judgment as a matter of law should be affirmed.

Dated:  April 25, 2013                Respectfully submitted,

                                                  ROPERS, MAJESKI, KOHN &
                                                  BENTLEY


                                                  By/s/ Robert Andris
                                                     Robert Andris
                                                     Lael Andara
                                                     Attorneys for Defendants-Appellees
                                                     Antec, Inc., Best Buy Co., Inc., and
                                                       Micro Electronics, Inc.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on April 25, 2013, true copies of the

foregoing **APPELLEES' BRIEF** were served electronically via CM/ECF, email

and U.S. mail upon counsel for appellant listed below:

STEPHEN J. DRISCOLL
SAUL EWING, LLP
1500 Market Street, 38th Floor
Philadelphia, PA 19102
(215) 972-7872
sdriscoll@saul.com

*Counsel for Plaintiff-Appellant*

Additionally, two paper copies will be mailed to the above counsel at the

time paper copies are sent to the Court.

Upon acceptance by the Court of the e-filed document, six paper copies will

be filed with the Court, via Federal Express, within the time provided in the

Court's rules. The brief was originally filed and served on April 25, 2013.

By:/s/ Riedell, Roxana
ROPERS, MAJESKI, KOHN &
BENTLEY

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Federal Rules of Appellate Procedure, rule 32(a)(7)(c), I hereby certify that this Appellant's Reply Brief was created in Times New Roman typeface, 14 point font. This brief contains 7720 words, exclusive of tables, certifications and cover, as counted by the Microsoft Word system used to create the brief.

Dated:  April 25, 2013                    By  /s/  Robert Andris
                                                        Robert Andris
                                                        *Attorneys for Defendants-Appellees*